749 F.2d 181
 5 Employee Benefits Ca 2689
 Alexander P. SMITH, Trustee for Stanley Jerome Mirman and
Benita Bernstein Mirman, Debtors, Appellant,
v.
Stanley Jerome MIRMAN; Virginia National Bank, as Trustee
for the Pension and/or Profit Sharing Plans of Tidewater
Valu Fair Supermarkets, Inc., Lakeland Grocery Corporation,
West View Foods, Inc. and 87 Grocery Corporation; Bank of
Virginia; Elliot Furman and Andrew M. Fekete, Appellees.
In re Stanley Jerome MIRMAN and Benita Bernstein Mirman, Debtors.
 No. 84-1294.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 2, 1984.
Decided Nov. 29, 1984.
 
 Alexander P. Smith, Norfolk, Va. (Smith & Owens, Norfolk, Va., on brief), for appellant.
 Leonard D. Levine, Virginia Beach, Va. (Pender & Coward, Virginia Beach, Va., on brief), and Lawrence J. Kipka, Newport News, Va., for appellees.
 Before WIDENER, SPROUSE and WILKINSON, Circuit Judges.
 WILKINSON, Circuit Judge:
 
 
 1
 The question presented is the validity of assignments made by an employee of his interest in an ERISA profit sharing plan, when the purported assignments were executed after corporate termination of the plan but prior to actual distribution of the plan's assets. Because benefits under the plan were fully vested upon the plan's stated termination date in December 1981, the district court held that assignments executed in January and February of 1982 were valid. Because we conclude that ERISA's anti-alienation provisions continue to govern administration of a plan's assets throughout the processes of winding up and distribution, we reverse.
 
 
 2
 Stanley Mirman was one of the participants in the Valu Fair Profit Sharing Plan (the "plan"). Following the sale of all corporate assets to another corporation, the directors of Tidewater Valu Fair Supermarkets, Inc. passed a resolution on December 6, 1981, terminating the plan as of that date and calling for assets of the plan to be distributed to participants upon approval by the Internal Revenue Service of the qualification of the plan's termination. In January and February of 1982, Mirman assigned portions of his share in the plan's funds to Elliot Furman and Andrew M. Fekete, appellees in this action. In October 1982, the IRS approved the plan's termination, relating its approval back to a proposed termination date of December 31, 1981. In December 1982, the plan administrator ordered distribution of its assets, and all funds (except those here under dispute) were distributed on December 30, 1982.
 
 
 3
 Meanwhile, on September 3, 1982, an involuntary petition in bankruptcy was filed against Stanley Mirman under Chapter 7 of the federal Bankruptcy Act, Title 11 of the United States Code. Alexander P. Smith, appellant herein, was subsequently appointed trustee (the "trustee") to administer Mirman's estate; as such, he succeeded to any interest that Mirman had in assets of the plan. The trustee sought to have the pre-bankruptcy assignments set aside, but both the bankruptcy judge and the district court judge to whom the order was appealed upheld them as valid. It is from the ruling of the district court that the trustee now brings this appeal.
 
 
 4
 The answer to the question before us hinges upon the applicability of Sec. 206(d)(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Sec. 1056(d)(1), which states that "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." We hold that this statutory requirement continued to apply to the administration of the plan's assets until December 31, 1982, the date of actual distribution. The policies underlying the unequivocal desire of Congress not to permit alienation of ERISA benefits extend throughout the pre-distribution period.
 
 
 5
 * Congress enacted ERISA, 29 U.S.C. Sec. 1001 et seq., to establish "a comprehensive federal scheme for the protection of pension plan participants and their beneficiaries." American Telephone and Telegraph Co. v. Merry, 592 F.2d 118, 120 (2d Cir.1979). Its "most important purpose" is to "assure American workers that they may look forward with anticipation to a retirement with financial security and dignity, and without fear that this period of life will be lacking in the necessities to sustain them as human beings within our society." S.Rep. No. 93-127, 93d Cong., 2d Sess (1974), reprinted in U.S.Code Cong. & Admin.News, pp. 4639, 4849 (1974). Congress prescribed in ERISA detailed and comprehensive provisions relating to reporting and disclosure, participation and vesting, funding of plans, fiduciary responsibilities of plan administrators or trustees, enforcement, and the necessity for plan termination insurance in certain instances. Among the provisions designed to "further ensure that the employee's accrued benefits are actually available for retirement purposes" was the requirement that benefits may not be assigned or alienated. H.R.Rep. No. 93-807, 93d Cong., 2d Sess. (1974), reprinted in U.S.Cong.Code & Admin.News, p. 4734 (1974).
 
 
 6
 In order to induce employers to establish ERISA pension and profit sharing plans, Congress provided favorable tax treatment for both employers and participants in plans determined to be qualified by the Internal Revenue Service. S.Rep. No. 93-383, 93d Cong., 2d Sess. (1974), reprinted in U.S.Cong. & Admin.News, pp. 4898-99, 4960. Under the Internal Revenue Code, a qualified plan not only must reflect the anti-alienation language of ERISA itself, but must unequivocally prohibit any access to plan funds by creditors of participants. IRC Sec. 401(a)(13), 26 U.S.C. Sec. 401(a)(13), provides, in relevant part, as follows:
 
 
 7
 A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated.
 
 
 8
 The Treasury Regulation issued under this provision is even more specific:Under section 401(a)(13), a trust will not be qualified unless the plan of which the trust is a part provides that benefits provided under the plan may not be anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process. Treas.Reg. Sec. 1.403(a)-13(b)(1).
 
 
 9
 The Regulation goes on to define "assignment" and "alienation" as follows:
 
 
 10
 Any direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit payment which is, or may become, payable to the participant or beneficiary. Treas.Reg. Sec. 1.401(a)-13(c)(ii).
 
 
 11
 Under the quoted statute and regulation, an employee's accrued benefits under a qualified plan may not be reached by judicial process in aid of a third-party creditor. See, e.g., Tenneco v. First Virginia Bank of Tidewater, 698 F.2d 688 (4th Cir.1983); General Motors Corp. v. Buha, 623 F.2d 455 (6th Cir.1980). Some courts have created an exception where the debt is support due by the employee to his spouse or children, on the grounds that part of ERISA's purpose is to benefit dependents as well as employees and that dependents are not "creditors" within the general meaning of that term. See, e.g., Stone v. Stone, 450 F.Supp. 919 (N.D.Cal.1978), aff'd, 632 F.2d 740 (9th Cir.1980), cert. denied, 453 U.S. 922, 101 S.Ct. 3158, 69 L.Ed.2d 1004 (1981) (applying community property concepts to find an ownership interest in an employee's spouse); American Telephone & Telegraph Co. v. Merry, 592 F.2d 118 (2d Cir.1979); Cody v. Riecker, 454 F.Supp. 22 (E.D.N.Y.1978), aff'd, 594 F.2d 314 (2d Cir.1979). However, benefits are generally required to be in "pay status" in order for a participant's interest to be found to be subject to garnishment for support of dependents, Monsanto Co. v. Ford, 534 F.Supp. 51 (E.D.Mo.1981), and some courts have insisted that a literal reading of the statute precludes attachment even for support of dependent family members. See, e.g., General Motors v. Townsend, 468 F.Supp. 466 (E.D.Mich.1976).
 
 
 12
 The only statutory exceptions to the strong prohibition against alienation are very narrow in scope. Section 206(d)(2) of ERISA, 29 U.S.C. Sec. 1056(d)(2). For purposes of a qualified plan, IRC Sec. 401(a)(13) elaborates upon the ERISA provision and excludes from the definition of assignment and alienation "any voluntary and revocable assignment of not to exceed ten percent of any benefit payment made by any participant who is receiving benefits under the plan ..." (emphasis added) and also allows a plan itself, but not a third party, to make a loan to a participant secured by his accrued nonforfeitable benefit, so long as other Code criteria are met.[1] In addition, Treas. Reg. Sec. 1.401(a)-13(b)(2) excludes from prohibited creditors' attachments certain federal tax levies and executions.
 
 
 13
 Thus, a review of the relevant legislative history, case law, and statutory provisions reveals a strong public policy against the alienability of an ERISA plan participant's benefits. Even the narrow judicial and statutory exceptions to the alienation prohibition occur mainly when a participant is receiving benefits under the plan, not (as we have here), where there is a fund awaiting distribution. None of these exceptions applies to the case before us.
 
 II
 
 14
 Appellees do not dispute the general principle of non-assignment. Their argument is that in the present situation, since a vote on termination was taken and distribution thereby became inevitable, an assignment should be allowed by an employee entitled to a share of the trust. Nothing in ERISA or in the Internal Revenue Code sections governing qualified plans supports such a view. In fact, the policies cited in the legislative history, in the statute itself, and in the relevant case law militate against any rights of alienability prior to actual distribution.
 
 
 15
 At the time that the corporate resolution to terminate the plan was passed in December 1981, the path from termination to actual distribution was neither swift nor certain. Because the directors voted to seek a determination letter qualifying the plan's termination, the plan administrator had to file Internal Revenue Service Form 5310, "Application for Determination Upon Termination ...," with the District Director, who would review it and perhaps ask for further information or even require amendments to the plan prior to forwarding the application to the Key District Office for further review and eventual issuance of a determination letter.[2] This was a process that could reasonably be expected to run from several months to more than a year. Indeed, it did require ten months, though an unfavorable ruling could have led to lengthy conferences and perhaps appeals prior to final resolution. See Treas.Reg. Sec. 601.201(o), detailing the determination letter procedure and possible appeals. See generally, Larry Thrailkill, "Determination Letter Process" in B. Billman, V. Zonana, Introduction to Qualified Pension and Profit-Sharing Plans (New York Practising Law Institute No. 129, 1979).
 
 
 16
 During this time, distribution is held in abeyance and ERISA provisions continue to govern administration of the trust. See Stuart Offer, "Plan Termination," in 1978 ERISA Planning and Compliance Conference, D-1-D-33 (California Certified Public Accountants Foundation for Education and Research 1978) (such a "wasting asset" trust is still considered a "plan" for purposes of the Internal Revenue Code, citing Rev.Rul. 69-157, 1969-1 C.B. 115). The fiduciary responsibilities ERISA imposes, Secs. 401-414, 29 U.S.C. Secs. 1101-1114, including "Termination of Plan" provisions, Sec. 403(d), 29 U.S.C. Sec. 1103(d), apply to the plan administrator's actions until all funds are distributed. The Internal Revenue Code contains rules that must be followed with respect to plan termination in order for a plan to maintain its qualification, and the pertinent Internal Revenue Service forms must still be filed. See generally, IRC Sec. 401; more specifically, see Treas.Reg. Sec. 1.401.6 promulgated thereunder. There is simply no statutory authorization for applying the various provisions of ERISA or the pertinent sections of the Internal Revenue Code only at certain times in the life of a plan.
 
 
 17
 This is especially true of the provision at issue here. We see a danger in eroding through exception the anti-alienation policy of ERISA. That entire legislation was aimed at guaranteeing the security of retirement income for American workers. This was achieved primarily through the vesting and funding requirements, but the additional safeguard of non-alienability of one's plan interest is no less important. We decline to participate in the diminution of these safeguards in circumstances which might seem harmless enough in particular instances but which, in the aggregate, might invite creditors to believe that ERISA funds are not, after all, inviolate.
 
 
 18
 Moreover, our holding that the non-assignability provisions of ERISA and the Internal Revenue Code continue to govern during this uncertain interval between termination (or vote to terminate) and distribution defeats the legitimate expectations of no one.[3] In the normal course of events, participants have no expectation of receiving any funds from their plans prior to retirement, so their financial planning is not based on the possibility of premature distribution. Third party creditors have been forewarned by statute that they may not assume an interest in these funds or subject them to garnishment or execution of any kind. Such creditors must seek their security elsewhere than in the pension and profit-sharing interests of their debtors.
 
 
 19
 Trippet v. Smith, 592 F.2d 1112 (10th Cir.1979), relied on by appellees, is inapplicable to the case at bar. Trippet concerned an employee benefit plan that had been terminated in October 1973, eleven months before passage of ERISA and fourteen months prior to its effective date. Under the factual circumstances, we agree with the Trippet court that "A terminated plan the corpus of which is in the process of liquidation before the effective dates in ERISA is not a 'plan' as contemplated by the Act." 592 F.2d 1113. The same rationale applies to Berry v. Cadence Industries Corp., 552 F.Supp. 1284 (E.D.Pa.1982), aff'd, 720 F.2d 659 (3d Cir.1983), where the pension trust in question was terminated July 1, 1970. Section 514(b)(1) of ERISA, 29 U.S.C. Sec. 1144(b)(1), states plainly that "This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975." Clearly, it would not be proper to seek to apply the sweeping changes of ERISA to plans terminated before the statute became effective, even where some liquidation processes were still in progress after that time.
 
 
 20
 Our holding in Tenneco v. First Virginia Bank of Tidewater, 698 F.2d 688 (4th Cir.1983) is relevant here. In that case, applying Sec. 206(d) of ERISA and Sec. 401(a)(13) of the Internal Revenue Code, we held that an employee's interest in an ERISA thrift plan and stock ownership plan was not subject to garnishment by a judgment creditor of the employee, even though the benefits were payable to him in a lump sum at any time upon his request. Reasoning that "The statute and the regulation make no ... distinction between funds which have become fully vested and subject to withdrawal and funds which are subject to periodic disbursement ..." (emphasis added), we stated that "[t]he funds here had been accumulated under a general plan for retirement, and the statutory scheme clearly contemplates that they should remain available for that purpose ..." 698 F.2d 690 (emphasis added). In Tenneco, the funds had become payable to the employee by virtue of his departure from the company before retirement age, but we noted that there were other circumstances under which lump sums could become distributable. Id. at 690. Clearly, termination of a plan, such as we have here, is one such circumstance, and the funds should be similarly protected from alienation. Moreover, in the present situation, although the monies have become fully vested, as in Tenneco, supra, they were not immediately payable to employee Mirman at the time of his attempted assignments, because the resolution of the board of directors specifically provided for distribution upon IRS approval, which was a time uncertain in the future. We disagree with appellees' contention that Tenneco is inapposite because there the plan continued to exist, and here the entire plan was terminated. The same policies and provisions that required a finding of non-alienability there apply here as well.
 
 
 21
 The order of the district court is therefore
 
 
 22
 REVERSED.
 
 
 
 [1]
 The Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97-248, 96 Stat. 324 (1982), narrowed this exception by adding Internal Revenue Code Sec. 72(p), 26 U.S.C. Sec. 72(p), which states that loans from qualified plans to participants will be considered distributions unless certain strict criteria are met with respect to both the amounts of the loans and their duration. These provisions were enacted to ensure that benefits would be available upon the participant's retirement. See Michael Canan, Qualified Retirement Plans, (Supp.1983)
 
 
 [2]
 The record in fact shows inquiries from the District Director's Office that required consultation between Tidewater Valu Fair's attorney and its plan administrator and the submission of further information before the determination letter was issued
 
 
 [3]
 The issue of whether a trustee in bankruptcy may succeed to a plan participant's interests prior to distribution is not before us, and we offer no opinion on this point